UNITED STATES DISTRICT COURT

DISTRICT OF MINNESOTA

| | |
|---|---|
| MARK ANDERSON and KILLER WHALE HOLDINGS, LLC, a Minnesota limited liability company,<br><br>          Plaintiffs,<br><br>v.<br><br>DAIRY FARMERS OF AMERICA, INC., a foreign corporation,<br><br>          Defendant. | Civil No. 08-4726 (JRT/FLN)<br><br>**MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S FIRST MOTION FOR SUMMARY JUDGMENT** |

Thomas B. Hatch, Rachel L. Osband, and Thomas C. Mahlum, **ROBINS KAPLAN MILLER & CIRESI LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402-2015, for plaintiffs.

Anthony M. Mansfield and Amandeep S. Sidhu, **MCDERMOTT WILL & EMERY, LLP**, 600 Thirteenth Street NW, Washington, DC 20005; Bryan M. Webster and Joel G. Chefitz, **MCDERMOTT WILL & EMERY, LLP**, 227 West Monroe Street, Chicago, IL 60606; and Thomas A. Gilligan, Jr. and Nicholas J. O'Connell, **MURNANE BRANDT, PA**, 30 East Seventh Street, Suite 3200, Saint Paul, MN 55101, for defendant.

Plaintiffs Mark Anderson and Killer Whale Holdings, LLC (collectively, "plaintiffs") brought this action against defendant Dairy Farmers of America, Inc. ("DFA"), alleging that DFA violated Section 9 of the Commodities Exchange Act by manipulating prices for cheddar cheese and Class III milk futures on the Chicago Mercantile Exchange ("CME"). DFA filed this motion for summary judgment, arguing that the CEA's two-year statute of limitations bars plaintiffs' action. The issue before the

Court is whether plaintiffs knew or in the exercise of reasonable diligence should have known prior to July 17, 2006 of DFA's alleged misconduct. For the reasons set forth below, the Court denies the motion for summary judgment on statute of limitations grounds.[1]

## BACKGROUND

Mark Anderson is a commodities trader who began trading on the CME in late 2001 through his personal account and also through Killer Whale Holdings, LLC. (Anderson Decl. ¶ 11, Docket No. 75.) Plaintiffs traded a variety of commodities on the CME, including Class III milk futures. (*Id.*) Defendant DFA is a dairy marketing cooperative owned by 18,000 dairy farmers in 48 states. (*Id.* Ex. C at 2.) "DFA markets the milk produced by its members, manufactures dairy products, food components and ingredients, and formulates and packages shelf-stable dairy products." (*Id.*) DFA trades on the CME. (*Id.* at 3.)

---

[1] On November 2, 2009, while this motion was pending, DFA filed a motion for summary judgment arguing that DFA is entitled to judgment as a matter of law because Anderson has not pleaded or adduced evidence that DFA intended to cause an artificial price for cheese or Class III milk futures. (*See* Docket No. 102.) The Court heard oral argument on February 24, 2010, and an Order on that motion is forthcoming. The Court also notes that in the second motion for summary judgment, the parties discuss at length the elements of a cause of action for manipulation under the Commodities Exchange Act. The Court's analysis of the statute of limitations here necessarily considers when a cause of action for manipulation accrues, but in doing so, the Court only considers the parties' arguments advanced in relation to the instant motion for summary judgment.

## I. CLASS III MILK FUTURES AND THE CME CHEESE SPOT CALL

Traders meet on the CME Spot Call to trade various futures contracts, including Class III milk futures and cheddar cheese. (Anderson Decl. ¶ 12, Docket No. 75.; Harty Decl. ¶ 4, Docket No. 52.) Class III milk futures are traded daily on the CME in units of 200,000 pounds. (Anderson Decl. Ex. C at 2, Docket No. 75.) A Class III milk futures contract is cash-settled against the United States Department of Agriculture Class III milk price. (*Id.*) Class III milk is the milk that is used to make cheese, and the Class III milk prices are calculated by reference to, *inter alia*, the price of cheddar cheese. (Anderson Decl. ¶ 12; Ex. C at 2, Docket No. 75.) In other words, cheddar cheese prices are a significant determinant of the price of Class III fluid milk and Class III milk futures contracts. (*Id.* Ex. C. at 2; Garrod Decl. Ex. A at 22-28, Docket No. 77.)

Cheddar cheese is also offered on the CME Cheese Spot Call in the form of 500-pound barrels and 40-pound blocks, and is traded in 40,000-44,000 pound quantities known as "loads" or "carloads." (Anderson Decl. Ex. C at 2; Garrod Decl. Ex. B, Docket No. 77.) The CME cheese spot market is a "thin market" – that is, it handles a very small proportion of all United States bulk cheddar cheese transactions – but the cheese spot market effectively sets the market price for most cheese and milk sales across the country. (Garrod Decl. Ex. A. at 9, 22-28, Docket No. 77; *see also* Anderson Decl. Ex. C at 3, Docket No. 75 ("The volume of cheddar cheese traded on the CME Cheese Spot Call comprises less than two percent of the annual U.S. supply of cheddar cheese.").) Unlike futures contracts, such as the Class III milk futures contracts traded on the CME, "where delivery of the underlying cash product is optional," delivery of cheese traded on

the CME Cheese Spot Call occurs within a few business days of the execution of the sale. (Harty Decl. ¶ 4, Docket No. 52.)

## II. DFA'S TRADING ACTIVITIES FROM MAY 21, 2004, TO JUNE 22, 2004

Plaintiffs allege that DFA's trading activities from May 21, 2004, through June 22, 2004, (the "relevant time period") violated Section 9 of the Commodities Exchange Act ("CEA"), which prohibits the manipulation of prices for commodities in interstate commerce. (*See* Am. Compl. ¶ 18, Docket No. 83.)

### A. DFA's Trading Activities on the CME

In May 2004, plaintiffs acquired a substantial short position in Class III milk futures contracts that would settle in June, July, and August 2004, acting on the belief that cheddar cheese prices and Class III milk futures prices would fall. (Anderson Decl. ¶¶ 14-16, Docket No. 75.) Indeed, although block cheddar cheese prices were $2.20 per pound in the middle of April 2004, those prices declined slowly, settling at $2.15 through May 11, 2004. (Garrod Decl. Ex. C at DFAI0095589-629 to -634, Docket No. 77.) On May 12, the block cheddar cheese price dropped to $2.00, where it remained for six days. (*Id.* at DFAI0095589-634 to 38.) On May 21, the CME block cheddar cheese price dropped an additional 20 cents to $1.80. (*Id.* at DFAI0095589 to 638.) Between May 21, 2004, and June 22, 2004, the CME block cheddar cheese price remained at $1.80.

In December 2008, the Commodities Futures Trading Commission ("CFTC"), in a proceeding relating to DFA's spring 2004 trading activities on the CME, found:

> Beginning on April 14, 2004, as sellers offered cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese. From May 21 to June 23, 2004, DFA . . . purchased and took delivery of a total of 323 loads (approximately 40,000 pounds per load) of cheddar cheese blocks at $1.80 per pound on the CME Cheese Spot Call. During this period, DFA was the sole purchaser of cheddar cheese blocks on the CME.

(Anderson Decl. Ex. C at 3, Docket No. 75.)

Notably, in the months leading up to May 2004, DFA purchased a number of long speculative June, July, and August 2004 Class III milk futures contracts on the CME. (Garrod Decl. Ex. D, Wilson CFTC Dep. Tr. at 47-52, Docket No. 77.) Plaintiffs allege that DFA held long Class III milk futures contracts in excess of the CME limit of 1500 contracts. *See* CME Rule 5202.E ("No person shall own or control more than: 1500 contracts long or short in any contract month."). Specifically, plaintiffs allege that as of May 21, 2004, DFA and its affiliates held 6,172 June contracts, 4,656 July contracts, and 4,227 August contracts. (Anderson Decl. Ex. C at 3, Docket No. 75.) Because dairy product prices, including cheddar cheese prices, continued to decline, "DFA's Class III milk futures position reflected an unrealized loss." (*Id.*)

Plaintiffs allege that DFA had no need for the cheddar cheese purchased during the relevant time period, and that DFA purchased cheddar cheese on the CME Cheese Spot Call to support cheddar cheese prices and, consequently, Class III milk futures prices, so as to avoid losing millions of dollars on its long futures contracts. (*See* Garrod Decl. Ex. F, Docket No. 77.) In other words, plaintiffs contend that DFA's purchase of cheddar cheese blocks was an attempt to sustain cheddar cheese and Class III milk futures prices while DFA liquidated its long June, July, and August Class III milk futures

contracts. (*See generally* Pls.' Mem. in Opp'n to Mot. for Summ. J. at 5-8, Docket No. 74.) Plaintiffs allege that DFA's cheddar cheese purchases in fact supported the cheddar cheese and Class III milk futures prices, which eroded plaintiffs' short June, July, and August 2004 Class III milk futures contracts. (*Id.* at 7.) Plaintiffs claim that they suffered a combined $6 million loss as a result of DFA's trading activities on the CME Cheese Spot Call during the relevant time period. (Am. Compl. ¶ 29, Docket No. 83.) DFA responds that it purchased cheddar cheese during the relevant time period to meet customer demand, which is a legitimate business purpose. (*See* Webster Decl. Ex. 6, Docket No. 53.)

**B.  Contemporaneous Public Information Regarding DFA's Trading Activities**

Various publications reported on DFA's trading activities during the relevant time period. For example, on June 28, 2004, the *Pizza Marketplace* trade newsletter reported that DFA "had supported the $1.80 price for nearly six weeks. In that brief span DFA purchased about 16 million pounds of cheese[.]" (Webster Decl. Ex. 4, Docket No. 53.) The same newsletter reported on July 8, 2004, that DFA purchased every one of 400 loads of cheddar cheese on the CME during a two-month period in the spring, with one commenter noting, "Somebody definitely needed cheese." (*Id.* Ex. 5 at DFAI0079439 to 40.)

In October 12, 2004, DFA CEO Gary Hanman gave a speech at the Dairylea Cooperative Annual Meeting in which he stated:

> DFA, I think I have told you before, believes in being a market maker. . . . As that market moves, since that market is the basis on which all people sell cheese, if you can have a positive influence on that market, you can have a positive influence on that price.
>
> We did make a long significant stand at 1.80 a block. . . . [W]e were the main buyer of cheese on the CME trying to make a statement to the trade that that we thought 1.80 was about the right price for 40-pound blocks of cheddar cheese. And notice on one day, about the 7th of June, we, DFA, bought 52 loads of cheese on that market that day, a record number of transaction[s]. After we had bought cheese that we needed for our market, for our customers, for our demand, we backed out, and when we did the market you can see it fell to about 1.36.

(*Id.* Ex. 6 at DFAI0079396 to 98.)

On December 30, 2004, the *Chicago Tribune* reported on Hanman's speech, noting that "[w]ith timed trades through Chicago's Merc, [DFA's] Gary Hanman has found a new way to support cheese prices, earning farmers an extra $1.3 billion this year." (*Id.* Ex. 7 at DFAI0079374.) The article further stated:

> It's a strategy that has made the dairy group the dominant buyer of cheese at the Mercantile Exchange, conducting more than half of all purchases, according to several sources who track the exchange, where trades are confidential. Here's how it works: The cooperative buys hundreds of truckloads of cheddar cheese at the Merc each year, timing its purchases for maximum influence on the cheese price. If Hanman can boost the cheddar cheese price at the Merc, dairy farmers are paid extra for their raw milk. . . .
>
> Whether the dairy group's strategy is legal, though, is a matter of debate. That's partly because the market is so obscure it falls into a gray area of the law.

(*Id.* at DFAI0079374 to 75.) The Associated Press ran a similar article on the same day. (*Id.* Ex. 8.)

In April 2005, the National Family Farm Coalition issued a report entitled "Cheese Trading on the Chicago Mercantile Exchange and the Public Interest," which reported

Hanman's speech and stated: "There are two examples which suggest DFA manipulated prices on the CME. This is not to say DFA has the power to manipulate prices with [sic] the cooperation of the few other traders. That would be very unlikely." (*Id.* Ex. 21.)

Also in April 2005, the *Chicago Tribune* reported on a CFTC investigation of cheddar cheese purchases on the CME in 2004. (*Id.* Ex. 23.) The article stated, "Amid allegations that the market is manipulated by a handful of powerful insiders, the Commodities Futures Trading Commission has reportedly requested documents on trading in the cheddar cheese pit at the Chicago Mercantile Exchange." (*Id.* at DFAI0079460.) The article also noted that protesters stood outside the CME protesting the lack of enforcement of trading rules, specifically referring to DFA's trading activities. (*Id.*) Another publication, *The Milkweed*, reported in May 2006 that the "CFTC [was] Probing CME cash market activities." (*Id.* Ex. 24.) *The Milkweed* also reported that one of the "key targets" of the investigation was DFA and that the "CFTC's specific angle is alleged manipulation of cash Cheddar markets that may have influenced settlement futures and options contracts." (*Id.*)

  **C. Meeting Between Anderson and Hanman in Kansas City**

In December 2005, Anderson met with Hanman in Kansas City in an effort to build Anderson's nonfat dry milk business. Anderson described the meeting as follows:

> I contacted Gary Hanman of DFA because I knew DFA was a large buttermilk producer, and I was hoping that I could do business with DFA. I flew to Kansas City in December 2005 and met with Mr. Hanman at the airport. I talked with Mr. Hanman about the opportunity to do business with DFA, and I also asked him about whether DFA had been a significant buyer of cheese on the CME in 2004 and if so, why. Mr. Hanman

confirmed the rumors that I had heard, i.e. that DFA was a substantial buyer of cheese on the CME in 2004, and he told me that DFA bought the cheese to meet the needs of its customers. At the time I did not know the total volume of cheese that DFA had purchased on the CME and had no reason to be suspicious of this answer. It was the answer I expected and assumed to be true.

(Anderson Decl. ¶ 23, Docket No. 75.)

Anderson asserts that at the time of his meeting with Hanman he was not aware of the articles about DFA's activities on the CME spot market. (*Id.*) Anderson alleges that he only became aware of both of his potential manipulation claims under the CEA[2] when he had before him a combination of documents: a CFTC subpoena to Anderson in August 2006 regarding the CFTC investigation of CME trading activities, a *Wall Street Journal* article in May 2008 noting that the CFTC's investigation of DFA was continuing and reporting a suspicious $1 million payment by Hanman to a DFA board member, and the CFTC's findings in December 2008 that DFA had been speculating in the Class III milk futures market. (*Id.* at ¶¶ 28-32.)

### D. Plaintiffs' Action Under the CEA

On July 17, 2008, plaintiffs filed a complaint against DFA, and on May 12, 2009, plaintiffs filed an Amended Complaint. (*See* Docket No. 83.) Plaintiffs bring two claims in the Amended Complaint alleging that DFA violated Section 9 of the CEA. Count I alleges that DFA purchased cheddar cheese on the CME Cheese Spot Call from May 21

---

[2] On May 12, 2009, plaintiffs filed with leave of the Court their Amended Complaint adding allegations that DFA violated the CEA by manipulating prices for Class III milk futures, in addition to the allegation in the original complaint that DFA violated the CEA by manipulating prices for cheddar cheese. (*See* Docket No. 83.)

through June 22, 2004, with the intent to manipulate the price of cheddar cheese on the CME cheese spot market. (*Id.* ¶¶ 36-42.) Count II alleges that DFA purchased cheddar cheese on the CME Cheese Spot Call from May 21 through June 22, 2004, with the intent to manipulate the price of Class III milk futures in an effort to liquidate long Class III milk futures positions that it had acquired in the preceding months. (*Id.* ¶¶ 43-51.) DFA moved for summary judgment, arguing that the CEA's two-year statute of limitations bars plaintiffs' claims.

## DISCUSSION

### I. STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## II. THE STATUTE OF LIMITATIONS UNDER THE COMMODITIES EXCHANGE ACT

To establish a CEA manipulation claim, the plaintiff must show "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d 513, 530 (S.D.N.Y. 2008) (internal quotation marks and footnote omitted).

The statute of limitations requires that the plaintiff bring the action "not later than two years after the date the cause of action arises." 7 U.S.C. § 25(c). "The proper standard for determining the commencement of the limitations period is when the plaintiff knew or in the exercise of reasonable diligence should have known of defendant's alleged misconduct." *Dyer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 928 F.2d 238, 240 (7th Cir. 1991); *Romano v. Merrill Lynch, Pierce, Fenner & Smith*, 834 F.2d 523, 528 (5th Cir. 1987) ("[T]he statute of limitations does not begin to run until the aggrieved party has either actual knowledge of the violation or notice of facts which, in the exercise of due diligence, would have led to actual knowledge thereof." (internal quotation marks omitted)). Under the latter standard, a plaintiff has the requisite knowledge when he has "enough facts to be on notice of a potential claim; [the limitations period] does not await leisurely discovery of the full details of the alleged scheme." *Davidson v. Wilson*, 763 F. Supp. 1465, 1469 (D. Minn. 1990) (internal quotation marks omitted), *aff'd*, 973 F.2d 1391 (8th Cir. 1992). That is, the statute of limitations begins to run when the plaintiff knows facts sufficient to "arouse [] suspicion

or curiosity." *Dyer*, 928 F.2d at 241 (internal quotation marks omitted; alteration in original). Anderson brought this action on July 17, 2008, and therefore any claim arising prior to July 17, 2006, would ordinarily be time-barred.

DFA argues that plaintiffs had both actual and constructive knowledge of DFA's alleged misconduct prior to July 17, 2006, and that the two-year statute of limitations bars plaintiffs' claims. Plaintiffs respond that the statute of limitations did not commence "until Plaintiffs knew, or should have known, of DFA's improper motive behind its mass purchases of block cheddar cheese on the CME spot cheese market from May 21 through June 22, 2004, and its purchases of excessive numbers of long Class III milk futures contracts." (Pls.' Mem. in Opp'n to Mot. for Summ. J. at 13, Docket No. 74.) According to Anderson, DFA's "motive was to cause artificially high prices on the CME spot cheese and Class III milk futures markets in order to protect, and profit from, its thousands of long June, July, and August 2004 Class III milk futures positions." (*Id.* at 13-14.)

Commodities manipulation under the CEA includes "a legitimate transaction combined with an improper motive." *In re Amaranth*, 587 F. Supp. 2d at 534; *see also id.* ("[E]ntering into futures contracts or swaps, without more, cannot constitute commodities manipulation. If a trading pattern is supported by a legitimate economic rationale, it cannot be the basis for liability under the CEA because it does not send a false signal. There must be 'something more,' some additional factor that causes the dissemination of false or misleading information."). In these circumstances, the consideration of whether plaintiffs knew or should have known through the exercise of reasonable diligence of DFA's alleged misconduct will necessarily require a

consideration of when plaintiffs knew or should have known of DFA's alleged intent to cause artificial cheddar cheese and Class III milk futures prices. Plaintiffs' knowledge that DFA purchased cheddar cheese during the relevant time period, without more, is insufficient to trigger the commencement of the statute of limitations.

### A. There Is a Fact Dispute About Whether Plaintiffs Had Actual Knowledge of DFA's Alleged Misconduct.

There is a genuine dispute of fact about whether, prior to July 17, 2006, plaintiffs had actual knowledge of DFA's alleged misconduct.

DFA argues that plaintiffs' own admissions establish that plaintiffs actually knew of the alleged misconduct. In particular, DFA submits that plaintiffs knew in June 2004 that they had suffered losses in their milk futures positions; that plaintiffs knew that cheese prices at higher-than-expected levels would cause a decrease in the value Class III milk futures contracts; that plaintiffs believed that DFA purchased all of the cheese on the CME Cheese Spot Call from May 21 to June 22; and that plaintiffs were suspicious about those purchases "at the latest in December of 2005." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 12, Docket No. 51.) DFA relies heavily on Anderson's description of his meeting with Hanman in Kansas City, where Anderson allegedly asked Hanman about DFA's reasons for buying large quantities of cheese in the spring of 2004. (*See* Am. Compl. ¶ 31, Docket No. 83; Anderson Decl. ¶ 23, Docket No. 75.)

Viewing the facts in a light most favorable to plaintiffs, a rational trier of fact could conclude that prior to July 17, 2006, plaintiffs did not have actual knowledge of DFA's alleged intent to cause artificial prices of Class III milk futures and cheddar

cheese. As characterized by DFA, Anderson's "suspicions" allegedly raised in his meeting with Hanman in December 2005 may suggest that Anderson had a duty of reasonable inquiry about the circumstances of DFA's cheese purchasing activities, but that, alone, does not demonstrate that Anderson had actual knowledge of DFA's motives. Moreover, Anderson's description of the meeting thoroughly undermines the contention that he had actual knowledge of DFA's misconduct[3]: Anderson inquired about DFA's cheddar cheese purchases and accepted Hanman's assertion that DFA did not act improperly.

DFA does not identify any additional evidence that plaintiffs actually knew of DFA's intent to cause artificial prices on the CME Cheese Spot Call and on the CME Class III milk futures market. Moreover, plaintiffs have provided evidence showing that after Anderson suffered losses on Class III milk futures contracts, he "assumed that he had been wrong in his assessment of the market and that DFA or whoever was buying cheese on the CME had a need for it. It never occurred to [him] that DFA or whoever was buying cheese on the CME did not have a need for it." (*Id.* ¶ 19.) Plaintiffs further submit evidence that they did not have knowledge of DFA's substantial long June, July, and August Class III milk futures positions, that DFA held those contracts in violation of CME Rules, or that DFA liquidated those contracts during the period when DFA was buying massive amounts of cheese. (*Id.* ¶ 32.) Plaintiffs, as noted above, submit evidence that they did not have actual knowledge of DFA's unlawful manipulation of the

---

[3] DFA cites a separate declaration made by Anderson, which describes the meeting in less detail. (*See* Webster Decl., Ex. 26 ¶ 5, Docket No. 53.)

spot cheese and Class III milk futures markets until Anderson knew of the CFTC's subpoena, was aware of the May 2008 *Wall Street Journal* article, and had reviewed the CFTC's December 2008 findings. (*Id.* ¶¶ 30-32.)

Viewing the evidence in a light most favorable to plaintiffs, a genuine fact dispute remains regarding plaintiffs' actual knowledge prior to July 17, 2006, of DFA's alleged misconduct. Accordingly, summary judgment is not warranted on the issue of actual knowledge.

### B. There Is A Fact Dispute About Whether Plaintiffs Had Constructive Knowledge of DFA's Alleged Misconduct.

Even if plaintiffs did not actually know of their manipulation claim, the statute of limitations begins to run when plaintiffs are "aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge" of their claims. *See Great Rivers Coop. of SE Iowa v. Farmland Indus., Inc.*, 120 F.3d 893, 896 (8th Cir. 1997). This objective standard, referred to as "inquiry notice," is based on the facts known to the victim of the alleged CEA violation. *See id.* Reviewing the record, the Court "must determine: (1) the facts of which the victim was aware; (2) whether a reasonable person with knowledge of those facts would have investigated the situation further; and (3) upon investigation, whether the reasonable person would have acquired actual notice of the defendant's [alleged misconduct]." *Id.*

Summary judgment is inappropriate on the question of whether, prior to July 17, 2006, plaintiffs were aware of facts "sufficient to arouse [] suspicion or curiosity" about

DFA's alleged misconduct. *See Dyer*, 928 F.2d at 241 (internal quotation marks omitted; alteration in original).

Turning to the first prong of the analysis, the Court will not "automatically impute public information to an injured party without a determination of some awareness of 'storm clouds' on the horizon." *Id.* (emphasis omitted). In some circumstances, however, courts impute knowledge of publicly available materials such as newspapers to establish constructive knowledge for the purposes of triggering the statute of limitations. *See, e.g.*, *Shah v. Meeker*, 435 F.3d 244, 249 (2d Cir. 2006); *Bush v. Rewald*, 619 F. Supp. 585, 602 (D. Haw. 1985).

DFA contends that prior to July 17, 2006, plaintiffs were aware (1) of their losses on the Class III milk futures market (Compl. ¶ 18, Docket No. 1); (2) that during the relevant time period the price of cheddar cheese remained "at a rate above that expected under normal market conditions" (*id.*); and (3) that DFA was responsible for cheese purchases. DFA further claims that there was a wealth of publicity in newspaper articles and trade newsletters discussing DFA's activities on the CME and that those articles establish that plaintiffs, prior to July 17, 2006, had constructive knowledge sufficient to commence the statute of limitations. DFA cites newsletters from 2004 that identified DFA as the sole purchaser of cheese during the relevant time period, articles in the *Chicago Tribune* and *St. Paul Pioneer Press* calling into question DFA's strategy in purchasing cheese to support cheese prices, and the 2005 *Chicago Tribune* and *Milkweed* articles reporting on the CFTC's investigation of trading on the CME and referencing DFA.

Plaintiffs respond by arguing that notwithstanding their knowledge of losses on the Class III milk futures market, they assumed that DFA's cheese purchases were made for legitimate business purposes and were unaware that DFA was acting with any improper purpose. In particular, Anderson states that he did not become aware that DFA was speculating on the Class III milk futures market until the CFTC released a report in December 2008 documenting DFA's Class III milk futures positions. (Anderson Decl. ¶ 32, Docket No. 75.) Plaintiffs also argue that Anderson's meeting with Hanman did not reveal the total volume of cheese purchased by DFA, DFA's improper motives for purchasing cheese, or DFA's long Class III milk futures positions. Finally, plaintiffs assert that they did not read news or trade articles discussing DFA's trading activities on the CME. (Anderson Decl. ¶ 24, Docket No. 75.)

In these circumstances and at summary judgment, the Court will not impute knowledge of DFA's alleged illegal conduct to plaintiffs based on the newspaper and newsletter articles adduced by DFA. The 2005 *Chicago Tribune* article is not adequately probative, as it mentions the CFTC investigation but does not definitively report that the CFTC was investigating DFA – it only indicates that protesters were concerned about DFA's role. Moreover, the remainder of the cited articles are, in the Court's view, too obscure or insufficiently probative of DFA's allegedly improper motives to permit at summary judgment imputation of knowledge of their contents even to a sophisticated investor like Anderson. *See Great Rivers Coop.*, 120 F.3d at 897 ("The determination of awareness is by its terms a factual analysis, and a **fact finder** may decide that a victim of fraud was indeed aware of public information." (emphasis added)).

The Court thus turns to the second prong of the analysis. In short, the inquiry into whether a reasonable person would have investigated further given knowledge of the facts that Anderson had prior to July 17, 2006, is for the fact finder. That is, the record before the Court demonstrates that there is a fact question about whether plaintiffs' knowledge prior to July 17, 2006, of their losses, of DFA's role in purchasing cheddar cheese during the relevant time period, and other undisputed facts would lead a reasonable person to further investigate a potential cause of action.

Given that analysis, the Court need not reach the question under the third prong of the analysis: whether plaintiffs would have acquired actual knowledge of DFA's alleged illegal conduct had they investigated further. In sum, the issues of plaintiffs' knowledge of facts and whether a reasonable person would have acted on that knowledge are not appropriate for summary judgment in these circumstances.

## III.  FRAUDULENT CONCEALMENT

"Under the equitable tolling doctrine of fraudulent concealment, the running of a statute of limitations is tolled where the plaintiff demonstrates that: (1) the defendant took affirmative steps to conceal the plaintiff's cause of action; and (2) the plaintiff could not have discovered the cause of action despite exercising due diligence." *See Jarrett v. Kassel*, 972 F.2d 1415, 1423-24 n.6 (6th Cir. 1992) (applying federal fraudulent concealment law to claims under the CEA).

Plaintiffs assert that two affirmative acts of concealment by DFA tolled the statute of limitations. First, plaintiffs claim that Hanman explicitly told Anderson in December

2005 that DFA made block cheddar cheese purchases during the relevant time period to meet customer demand. Second, plaintiffs claim that DFA disseminated a "narrative," including in Hanman's October 12, 2004, speech, claiming that DFA made its purchases of block cheddar cheese during the period in question to meet customer demand.

DFA argues that plaintiffs' fraudulent concealment allegations must fail because plaintiffs did not plead those claims with particularity and, regardless, plaintiffs had access to the facts regarding DFA's alleged manipulation. DFA points to the same evidence in support of plaintiffs' access to facts as it cites in support of its argument that plaintiffs were aware of sufficient facts to trigger the duty of inquiry into DFA's activities. DFA also contends that Hanman's denial of wrongdoing or explanation for DFA's purchases to Anderson cannot be considered fraudulent concealment.

The Court is skeptical that Hanman's confirmation to Anderson that DFA purchased cheese during the relevant time period is sufficient to toll the statute of limitations. The Court agrees with the view that, in general, "a denial of wrongdoing is no more an act of concealment than is silence." *Texas v. Allan Constr. Co.*, 851 F.2d 1526, 1532 (5th Cir. 1988). The Court therefore questions whether Hanman's assertion that DFA legitimately purchased cheese on the CME Cheese Spot Call tolls the statute of limitations on plaintiffs' claims. Hanman's speech on October 12, 2004, however, may suffice to establish fraudulent concealment. Viewing the facts in a light most favorable to plaintiffs, a rational trier of fact could conclude that Hanman intended his statements to the public in October 2004 to conceal DFA's motives for purchasing cheddar cheese to sustain cheddar cheese and Class III milk futures prices. Further, as discussed *supra*, the

facts are disputed regarding whether plaintiffs would have discovered their cause of action in the exercise of due diligence. Although the evidence of fraudulent concealment is somewhat weak, in these circumstances, the question is for the finder of fact.

Accordingly, the Court denies DFA's motion for summary judgment on the issues of whether the statute of limitations bars plaintiffs' claims and whether DFA's alleged fraudulent concealment tolled the statute of limitations.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Dairy Farmers of America, Inc.'s Motion for Summary Judgment [Docket No. 49] is **DENIED**.

DATED: March 29, 2010　　　　　　　　　　　_____s/ John R. Tunheim_____
at Minneapolis, Minnesota.　　　　　　　　　　JOHN R. TUNHEIM
　　　　　　　　　　　　　　　　　　　　United States District Judge