# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| MARK ANDERSON and KILLER WHALE HOLDINGS, LLC, a Minnesota limited liability company, | Civil No. 08-4726 (JRT/FLN) |
| Plaintiffs, | **MEMORANDUM OPINION AND ORDER** |
| v. | |
| DAIRY FARMERS OF AMERICA, INC., a foreign corporation, | |
| Defendant. | |

Thomas B. Hatch and Thomas C. Mahlum, **ROBINS KAPLAN MILLER & CIRESI LLP**, 800 LaSalle Avenue, Suite 2800, Minneapolis, MN 55402-2015, for plaintiffs.

Anthony M. Mansfield and Amandeep S. Sidhu, **MCDERMOTT WILL & EMERY, LLP**, 600 Thirteenth Street NW, Washington, DC 20005; Bryan M. Webster and Joel G. Chefitz, **MCDERMOTT WILL & EMERY, LLP**, 227 West Monroe Street, Chicago, IL 60606; and Thomas A. Gilligan, Jr. and Nicholas J. O'Connell, **MURNANE BRANDT, PA**, 30 East Seventh Street, Suite 3200, Saint Paul, MN 55101, for defendant.

Plaintiffs Mark Anderson and Killer Whale Holdings, LLC (collectively, "plaintiffs") brought this action against defendant Dairy Farmers of America, Inc. ("DFA"), alleging that DFA violated Section 9 of the Commodity Exchange Act ("CEA") by manipulating prices for cheese and Class III milk futures on the Chicago Mercantile Exchange ("CME"). DFA filed a motion for summary judgment, arguing that plaintiffs have not pleaded or adduced evidence showing that artificial prices for cheese

or Class III milk futures existed or that DFA intended to cause artificial prices. Plaintiffs and DFA also filed motions to exclude expert opinions. For the reasons set forth below, the Court denies DFA's motion for summary judgment, grants plaintiffs' motion to exclude James Jordan's expert opinion on mitigation of damages, denies without prejudice DFA's motion to exclude the expert testimony of Wayne Brown, and denies without prejudice plaintiffs' motion to exclude the expert testimony of Robert Mackay.

## BACKGROUND[1]

Mark Anderson is a commodities trader who began trading on the CME in late 2001 through his personal account and also through Killer Whale Holdings, LLC, which was formed in 2003. (Anderson Decl. ¶ 11, Docket No. 75.) Plaintiffs traded a variety of commodities on the CME, including Class III milk futures. (*Id.*) DFA is a dairy marketing cooperative owned by 18,000 dairy farmers in 48 states. (Anderson Decl. Ex. C at 2, Docket No. 95.) "DFA markets the milk produced by its members, manufactures dairy products, food components and ingredients, and formulates and packages shelf-stable dairy products." (*Id.*) DFA trades on the CME. (*Id.* at 3.)

## I. CLASS III MILK FUTURES TRADING AND THE CHEESE SPOT CALL ON THE CME

Traders meet on the CME Spot Call to trade various futures contracts, including Class III milk futures and cheddar cheese. (Anderson Decl. ¶ 12, Docket No. 75; Harty

---

[1] For the purposes of the motion for summary judgment, DFA states that it treats as undisputed Anderson's factual allegations pleaded in the Amended Complaint. (Def.'s Mem. in Supp. of Mot. for Summ. J. at 4 n.4, Docket No. 103.)

Decl. ¶ 4, Docket No. 52.) Class III milk futures are traded daily on the CME in units of 200,000 pounds, or 2,000 hundredweight of milk. (Anderson Decl. Ex. C at 2, Docket No. 75.) A Class III milk futures contract is cash-settled against the United States Department of Agriculture Class III milk price. (*Id.*) Class III milk is the milk that is used to make cheese, and the Class III milk prices are calculated by reference to, *inter alia*, the price of cheddar cheese. (*Id.* ¶ 12 & Ex. C at 2.) In other words, cheese prices are a component of the formula that determines the price of Class III fluid milk and Class III milk futures contracts. (*Id.* Ex. C. at 2; Garrod Decl. Ex. A at 22-28, Docket No. 77.)

Cheddar cheese is also offered on the CME Cheese Spot Call in the form of 500-pound barrels and 40-pound blocks, and is traded in 40,000-44,000 pound quantities known as "loads" or "carloads." (Anderson Decl. Ex. C at 2, Docket No. 75; Garrod Decl. Ex. B, Docket No. 77.) The CME cheese spot market is a "thin market" – that is, it handles a very small proportion of all United States bulk cheddar cheese transactions – but the CME cheese spot market effectively sets the market price for most cheese and milk sales across the country. (Garrod Decl. Ex. A. at 9, 22-28, Docket No. 77; *see also* Anderson Decl. Ex. C at 3, Docket No. 75 ("The volume of cheddar cheese traded on the CME Cheese Spot Call comprises less than two percent of the annual U.S. supply of cheddar cheese.").) Unlike futures contracts, such as the Class III milk futures contracts traded on the CME, "where delivery of the underlying cash product is optional," delivery of cheese traded on the CME Cheese Spot Call occurs within a few business days of the execution of the sale. (Harty Decl. ¶ 4, Docket No. 52.)

## II. DFA'S TRADING ACTIVITIES ON THE CME FROM MAY 21, 2004, TO JUNE 22, 2004

Plaintiffs allege that DFA's trading activities from May 21, 2004, through June 22, 2004, (the "relevant time period") violated Section 9 of the CEA, which prohibits the manipulation of prices for commodities in interstate commerce. (*See* Am. Compl. ¶ 18, Docket No. 83.)

In May 2004, plaintiffs – acting on the belief that cheddar cheese prices and Class III milk futures prices would fall – -acquired a substantial short position in Class III milk futures contracts that would settle in June, July, and August 2004. (Anderson Decl. ¶¶ 14-16, Docket No. 75.) Although block cheddar cheese prices were $2.20 per pound in the middle of April 2004, those prices declined slowly, settling at $2.15 through May 11, 2004. (Garrod Decl. Ex. C at DFAI0095589-629 to -634, Docket No. 77.) On May 12, the block cheddar cheese price dropped to $2.00, where it remained for six days. (*Id.* at DFAI0095589-634 to 38.) On May 21, the CME block cheddar cheese price dropped an additional 20 cents to $1.80. (*Id.* at DFAI0095589 to 638.) Between May 21, 2004, and June 22, 2004, the CME block cheddar cheese price remained at $1.80. (Am. Compl. ¶ 22, Docket No. 83.)

In December 2008, the Commodities Futures Trading Commission ("CFTC"), in a proceeding relating to DFA's spring 2004 trading activities on the CME, found:

> Beginning on April 14, 2004, as sellers offered cheddar blocks on the CME Cheese Spot Call, DFA purchased block cheddar cheese. From May 21 to June 23, 2004, DFA . . . purchased and took delivery of a total of 323 loads (approximately 40,000 pounds per load) of cheddar cheese blocks at $1.80 per pound on the CME Cheese Spot Call. During this period, DFA was the sole purchaser of cheddar cheese blocks on the CME.

(Anderson Decl. Ex. C at 3, Docket No. 75.)

Notably, in the months leading up to May 2004, DFA had purchased a number of long speculative June, July, and August 2004 Class III milk futures contracts on the CME. (Wilson CFTC Dep. Tr. 47-52, Aug. 3, 2006, Garrod Decl. Ex. D, Docket No. 77.) Plaintiffs allege that DFA held long Class III milk futures contracts in excess of the CME limit of 1500 contracts. *See* CME Rule 5202.E ("No person shall own or control more than: 1500 contracts long or short in any contract month."). Specifically, plaintiffs claim that as of May 21, 2004, DFA and its affiliates held 6,172 June contracts, 4,656 July contracts, and 4,227 August contracts. (Anderson Decl. Ex. C at 3, Docket No. 75.) Because dairy product prices, including cheddar cheese prices, continued to decline, "DFA's Class III milk futures position reflected an unrealized loss." (*Id.*)

Plaintiffs allege that DFA had no need for the cheddar cheese it purchased during the relevant time period. Plaintiffs allege that DFA's purchase of cheddar cheese blocks was an attempt to sustain cheddar cheese and Class III milk futures prices while DFA liquidated its long June, July, and August Class III milk futures contracts. (*See* Garrod Decl. Ex. F, Docket No. 77; *see also* Am. Compl. ¶ 22, Docket No. 83.) Plaintiffs allege that DFA's cheddar cheese purchases in fact supported the cheddar cheese and Class III milk futures prices, which eroded plaintiffs' short June, July, and August 2004 Class III milk futures contracts. (*Id.* ¶¶ 27-28.) Plaintiffs claim that they suffered a combined $6 million loss as a result of DFA's trading activities on the CME Cheese Spot Call during the relevant time period. (*Id.* ¶ 29.) In a letter to the CFTC, DFA stated:

It appears that from sometime in May 2004 forward, DFA's primary reason for purchasing block cheese on the CME was to defend the price at $1.80 to protect the value of DFA's existing inventories of physical cheese and its Class III milk futures contract positions. Another effect of supporting the price of cheese was support for the Class III milk price, which directly impacted milk payments to DFA's dairy farmer members.[2]

(Garrod Decl. Ex. 1 at 10-11, Docket No. 124.)

On November 2, 2009, DFA brought a motion for summary judgment arguing that plaintiffs have not established that artificial prices existed for cheese or Class III milk or that DFA intended to cause artificial prices for cheese or Class III milk. DFA also brought a motion to exclude plaintiffs' expert, Wayne Brown. Plaintiffs filed motions to exclude DFA expert Robert Mackay and to exclude DFA expert James Jordan's opinion on mitigation of damages. The Court first addresses DFA's motion for summary judgment, and then turns to the parties' motions to exclude.

I.  **MOTION FOR SUMMARY JUDGMENT**

A.  **Standard of Review**

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to

---

[2] DFA prefaced this statement to the CFTC by stating that it was assuming certain facts for the purposes of the letter, but "[b]ecause the Division and DFA are continuing to gather and confirm certain information . . . the Division should not consider the following assumed facts to be factual assertions by DFA. Furthermore, if additional or different material facts come to light, DFA will revise its analysis if necessary." (Garrod Decl. Ex. 1 at 2, Docket No. 124.)

return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### B. CEA Manipulation Claim

Section 9(a)(2) of the CEA makes it unlawful for "[a]ny person to manipulate or attempt to manipulate the price of any commodity in interstate commerce." 7 U.S.C. § 13(a)(2). The CEA does not define the term "manipulate," but federal courts and the CFTC have held that manipulation is "an intentional exaction of a price determined by forces other than supply and demand. *Frey v. CFTC*, 931 F.2d 1171, 1175 (7th Cir. 1991); *see also Volkart Bros., Inc. v. Freeman*, 311 F.2d 52, 58 (5th Cir. 1962) ("Manipulation is[] any and every operation or transaction or practice . . . calculated to produce a price distortion of any kind in any market either in itself or in relation to other markets. . . . Any and every operation, transaction (or) device, employed to produce these abnormalities of price relationship in futures markets, is manipulation." (third alteration in original) (internal quotation marks omitted)). To establish a market manipulation claim under Section 9(a) of the CEA, the plaintiff must show "(1) the defendant possessed an ability to influence market prices; (2) an artificial price existed; (3) the defendant caused the artificial price; and (4) the defendant specifically intended to cause the artificial price." *In re Amaranth Natural Gas Commodities Litig.*, 587 F. Supp. 2d

513, 530 (S.D.N.Y. 2008); *accord Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 247 (5th Cir. 2010).

While DFA concedes plaintiffs' factual allegations for the purposes of the motion for summary judgment, including the allegation that DFA intended to influence the price of cheese and Class III milk futures, DFA contends that "[p]laintiffs . . . do not allege, nor do they have evidence to show, that DFA intended to or actually created an artificial price for cheese or milk futures. Without proof of artificial price, there can be no manipulation under the CEA." (Def.'s Mem. in Supp. of Mot. for Summ. J. at 9, Docket No. 103.)

### 1.    Artificial Price and Intent to Cause an Artificial Price

As alluded to by DFA, the issue before the Court is whether plaintiffs have pleaded or adduced evidence that an artificial price for cheese and Class III milk futures existed.[3]  An artificial price is a "price which does not reflect basic forces of supply and demand." *Cargill, Inc. v. Hardin*, 452 F.2d 1154, 1163 (8th Cir. 1971); *see also United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) ("[M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to . . . market prices,

---

[3]  DFA argues that its purchases of cheese were a part of legitimate forces of supply and demand, and that an "intent to influence price" does not equate to an "intent to cause an artificial price."  In the Court's view, DFA's arguments address a single issue relating to Anderson's establishment of a CEA manipulation claim: whether plaintiffs must show that DFA committed fraud, engaged in sham or fictitious transactions or cornering activity, traded in a manner that disrupted orderly trading processes, or violated applicable trading rules.  Accordingly, although the two elements are distinct and must be separately proven, in these circumstances, the Court addresses the question of whether artificial prices existed together with the element of "intent to cause an artificial price."  *Cf. In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1057 (N.D. Ill. 1995) ("[T]here is no universally accepted measure or test of price artificiality, and . . . this element can be closely interrelated with the other three elements of a manipulation claim[.]").

a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone.").  To determine whether a price is artificial,

> One must look to the aggregate forces of supply and demand and search for those factors which . . . are not a legitimate part of the economic pricing of the commodity. . . . [W]hen a price is effected by a factor which is not legitimate, the resulting price is necessarily artificial.  Thus, the focus should not be as much on the ultimate price, as on the nature of the factors causing it.

*In re Ind. Farm Bureau Coop. Ass'n*, [1982-1984 Transfer Binder] Comm. Fut. Law. Rep. (CCH) ¶ 21,796, at 27,288 n.2; *accord CFTC v. Enron Corp.*, Civ. No. H-03-909, 2004 WL 594752, at *6 (S.D. Tex Mar. 10, 2004).

DFA asserts that "[i]n order to be manipulative, one must commit fraud, engage in sham or otherwise fictitious transactions or cornering activity, or trade in a manner that disrupts orderly trading processes or violates applicable trading rules."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 20, Docket No. 103.)  DFA contends that evidence of its intent to influence price, without establishing fraud, misrepresentation, or violation of trading rules, is insufficient to establish a CEA manipulation claim and that DFA's cheese purchases were a legitimate part of supply and demand.  The Court disagrees and declines to adopt or apply DFA's proposed standard.

Courts and the CFTC "generally agree that manipulation defies easy description.  As a result, manipulation cases tend to be characterized by fact-specific, case-by-case analysis."  *In re Soybean Futures Litig.*, 892 F. Supp. 1025, 1044 (N.D. Ill. 1995).  The test for manipulation "must largely be a practical one . . . . The aim must be therefore to

discover whether conduct has been intentionally engaged in which has resulted in a price which does not reflect basic forces of supply and demand." *Cargill*, 452 F.2d at 1163.

A number of manipulation cases under the CEA involve fraud, deceit, misrepresentation, or some violation of exchange rules by the defendant. *See, e.g.*, *United States v. Reliant Energy Servs., Inc.*, 420 F. Supp. 2d 1043, 1058 (N.D. Cal. 2006). Those cases, however, do not support a conclusion that a plaintiff **must** show a defendant engaged in fraudulent activity or violated applicable trading rules to establish manipulation. Other cases addressing manipulation under the CEA demonstrate that a plaintiff need not show fraudulent conduct, a misrepresentation, or some violation of trading rules to establish manipulation. *See, e.g.*, *In re Amaranth*, 587 F. Supp. 2d at 535 ("[T]he combination of a wrongful intent (or more accurately, the lack of a legitimate economic motive) and a legitimate transaction would constitute manipulation."); *In re Henner*, 30 Agric. Dec. 1151, 1198 (U.S.D.A. 1971).

The Court finds that to establish that an artificial price existed for the purposes of a CEA manipulation claim, a plaintiff need not establish fraud, misrepresentation, or a violation of exchange rules on the part of the defendant. *See Reliant*, 420 F. Supp. 2d at 1058-59. While "fraud and deceit are not legitimate market forces," *see id.* at 1058, "[t]he methods and techniques of manipulation are limited only by the ingenuity of man." *Cargill*, 452 F.2d at 1163. *Cf. General Foods Corp. v. Brannan*, 170 F.2d 220, 224 (7th Cir. 1948) ("[T]he common criteria **usual** in manipulation or corner cases are deceit, trickery through spreading of false rumors, concealment of position, the violation of express anti-manipulation controls, or other forms of fraud." (emphasis added)). Thus,

the appropriate inquiry is whether the specific facts of a case to support a finding that the commodity price was determined by forces other than legitimate forces of supply and demand and whether a defendant intended to cause that artificial price.

Federal courts and the CFTC have provided useful guidance in how to determine whether the facts of a case support a CEA manipulation claim. *Cf. In re Ind. Farm Bureau*, Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,281 (stating that the task of defining manipulation or attempted manipulation "has fallen to case-by-case judicial development"). For example, in *In re Amaranth*, the district court rejected the defendants' contention that a legitimate transaction, regardless of the intent of the defendants, cannot violate the CEA. *See In re Amaranth*, 587 F. Supp. 2d at 533-34. The court held: "Because every transaction signals that the buyer and seller have legitimate economic motives for the transaction, if either party lacks that motivation, the signal is inaccurate. Thus, a **legitimate transaction combined with an improper motive** is commodities manipulation." *Id.* at 534 (emphasis added). The Court emphasizes that such a formulation is not the only manner in which to determine, on a case-by-case basis, whether an artificial price exists or whether a defendant caused an artificial price. *In re Amaranth*, however, illustrates one way that a court may review the sufficiency of a CEA manipulation claim.

### 2. *United States v. Radley*

The Court is not persuaded that DFA's cited cases support its proposed rule. In particular, DFA relies on *United States v. Radley*, in which the district court addressed

the sufficiency of a criminal indictment that charged a defendant with, *inter alia*, manipulation under the CEA. 659 F. Supp. 2d 803, 806-09 (S.D. Tex. 2009). The district court dismissed all counts charging defendant with manipulation or attempted manipulation because the CEA statute was constitutionally vague and, "[a]lthough the government has alleged that defendants caused and intended to cause an increase in price, it has not adequately alleged that the increased price was artificial." *Id.* at 816. The district court reasoned:

> Since defendants have not been accused of making false or misleading statements, the effect of their actions on the market was part of the legitimate forces of supply and demand. . . . Acting in a manner that shifts the price of a commodity in a favorable direction is the business of profit-making enterprises, and if it is done without fraud or misrepresentation, it does not clearly violate the CEA.

*Id.* at 816. The district court further noted that "there is no universally accepted measure or test of price artificiality," and "[t]his uncertainty is the very thing that the constitutional vagueness doctrine is meant to protect against." *Id.*

Radley is not persuasive in the Court's analysis for two reasons. First, *Radley* is a criminal case and the district court in *Radley* did not attempt to define or limit what constitutes manipulation under the CEA, as suggested by DFA. Rather, *Radley* determined that Section 9 of the CEA was void for vagueness as a criminal statute because "a person of ordinary intelligence would not be able to determine that [the facts of the case as alleged in a criminal indictment] constitute price manipulation under the CEA." *Id.* at 812-13. *Radley*'s analysis relating to the constitutional requirement of definiteness in a criminal statute is not helpful to the Court in these circumstances.

Second, *Radley*'s and DFA's focus on a party's self-interested or profit-making motives misses the mark.  (*See* Def.'s Mem. in Supp. of Mot. for Summ. J. at 11, Docket No. 103. ("[B]uying more of a commodity than needed to fill customer orders, with the intent of raising transaction prices, does not remove the purchases from the legitimate supply and demand for the commodity.").)  Certainly, self-interest and profit-making motives do not remove a parties' conduct from the realm of legitimate forces of supply and demand.  *See, e.g.*, *In re Ind. Farm Bureau*, Comm. Fut. L. Rep. (CCH) ¶ 21,796. Classifying a motive as self-interested or profit-making, however, also does not render a party's conduct appropriate.

The Court finds it uncontroversial that an entity may act in its own self-interest or act with the intent to make a profit while trading in commodities and not run afoul of applicable trading rules or statutes.  On the other hand, entities that act fraudulently or disseminate false reports also, presumably, are acting in their self-interest and for the purpose of making a profit, although fraud and deceit are not legitimate forces of supply and demand.  In other words, generalizing an entity's motive as self-interested or profit-making does not remove the entity's conduct from the ambit of the CEA.  Instead, the inquiry must be whether the facts of a case support a finding that defendant specifically intended to subvert legitimate forces of supply and demand.

To prove that DFA intended to cause artificial prices on the CME Cheese Spot Call and on the Class III milk futures market, "it must be proven that [DFA] acted . . . with the purpose or conscious object of causing or effecting a price or price trend in the market that did not reflect the legitimate forces of supply and demand." *In re Ind. Farm*

*Bureau*, Comm. Fut. L. Rep. (CCH) ¶ 21,796 at 27,283. "Since proof of intent will most often be circumstantial in nature, manipulative intent must normally be shown inferentially from the conduct of the accused." *Id.*

The CME Cheese Spot Call is a thinly traded market, which during the relevant time period opened for only fifteen minutes a day and comprised only 2% of the sales of cheese in the United States. Yet, the price at which cheese traded on the CME Cheese Spot Call effectively set the price for cheese purchases nationwide. From May 21 to June 23, 2004, DFA purchased 323 loads of cheddar cheese blocks at $1.80 per pound. DFA was the sole purchaser of cheese on the CME Spot Call during that period. Plaintiffs allege that DFA's cheese purchases prevented cheese prices from dipping below $1.80 and that DFA was able to liquidate its long Class III milk futures contracts at a profit during the relevant time period. In addition, the price of cheese plummeted after DFA ceased purchasing cheese, indicating that DFA's purchases of cheese – allegedly without commercial need for the cheese—prevented the "determination of [cheese] prices by free competition alone." *See Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940); *see also Enron*, 2004 WL 594752, at *6 ("The CFTC alleges in its complaint that '[o]n July 19, 2001, artificial prices existed in the HH Spot Market, and in the NYMEX Henry Hub Futures as well.' The CFTC describes the time, market, and circumstances surrounding the 'price artificiality,' alleging that Shively engaged in a fifteen minute 'buying spree,' raising prices, and eventually unwound Enron's position in the market with a resultant price decline. The CFTC also points out that this activity caused prices in the NYMEX Henry Hub Futures Market to become artificial. The CFTC has alleged

enough to survive a motion to dismiss." (citations omitted)).  Viewing the facts in a light most favorable to plaintiffs, a reasonable trier of fact could find in plaintiffs' favor on their CEA manipulation claim.

Of course, the Court does not conclude as a matter of law that DFA's purchases of cheese on the CME Cheese Spot Call caused artificial prices for cheese or Class III milk futures or that DFA intended to cause an artificial price for cheese or Class III milk futures.  Rather, the Court concludes only that based on the facts pleaded by plaintiffs and on the record, there is a genuine dispute of fact as to whether the price of cheese and Class III milk reflected factors other than legitimate market forces of supply and demand and whether DFA intended to cause artificial prices.  *See In re Soybean Futures*, 892 F. Supp. at 1058 (stating that "[a]s a general matter, . . . questions of intent are inappropriate for resolution on summary judgment" but in some circumstances, dismissal may be appropriate if "the plaintiff presents no indication of motive and intent supportive of his position").

### 3.    Legitimate Supply and Demand

DFA argues that its purchases of cheese were part of legitimate supply and demand as a matter of law, and as a result, DFA asserts that no artificial prices for cheese or class III milk existed.  In particular, DFA argues that federal courts and the CFTC have "held that market participants may legally purchase more of a commodity than needed to fill customer orders or at apparently higher than necessary prices."  (Def.'s Mem. in Supp. of Mot. for Summ. J. at 10, Docket No. 103.)

The CFTC, however, has held that "[w]henever a buyer on the Exchange intentionally pays more than he has to **for the purpose of causing the quoted price to be higher than it would otherwise have been** . . . , the resultant price is an artificial price not determined by the free forces of supply and demand on the exchange." *In re Henner*, 30 Agric. Dec. at 1198 (emphasis added); *accord Enron*, 2004 WL 594752, at *6. Plaintiffs have alleged and adduced evidence that DFA purchased cheese on the Cheese Spot Call to prop up Class III milk futures prices to enable DFA to liquidate its long Class III milk futures position at a profit, and plaintiffs allege that those actions did not constitute legitimate forces of supply and demand. *See In re Amaranth*, 587 F. Supp. 2d at 534 ("[A] legitimate transaction combined with an improper motive is commodities manipulation."). DFA "treats as undisputed the factual allegations from Plaintiffs' Amended Complaint," (Def.'s Mem. in Supp. of Mot. for Summ. J. at 4 n.4, Docket No. 103), and states that its motion is premised on a dispute over the appropriate legal standard, not on a dispute regarding the material facts, (Reply Mem. at 18, Docket No. 138). For the reasons discussed above, plaintiffs' factual allegations and the record show that there is a genuine dispute of fact as to plaintiffs' CEA manipulation claims, and summary judgment is not warranted.

## III. MOTIONS TO EXCLUDE EXPERT OPINIONS

### A. Standard of Review

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Fed. R. Evidence 702. Under Rule 702, proposed expert testimony must

satisfy three prerequisites to be admitted. *See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001). First, evidence based on scientific, technical, or specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. *Id.* Second, the proposed witness must be qualified. *Id.* "Third, the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires. *Id.* (internal quotation marks omitted). The district court has a "gatekeeping" obligation to make certain that all testimony admitted under Rule 702 satisfies these prerequisites. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597-98 (1993). But an expert's opinion should be excluded as unreliable under the third prong only if that "opinion is so fundamentally unsupported that it can offer no assistance to the jury." *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001) (internal quotation marks omitted).

**B.     Plaintiffs' Motion to Exclude DFA Expert James Jordan's Opinion on Mitigation of Damages**

Plaintiffs ask the Court to preclude DFA's lost-profits expert, James V. Jordan, from offering at trial his opinion relating to mitigation of damages. (Mot. to Exclude Test. of James V. Jordan, Docket No. 111; Mem. in Supp. of Mot. to Exclude at 1, Docket No. 112.) Plaintiffs argue that Jordan's expert opinion is contrary to law on the duty to mitigate and that Jordan's opinion is based on his "personal opinion." (Mem. in Supp. of Mot. to Exclude at 1, Docket No. 112.)

Plaintiffs assert that they incurred the majority of their damages on June 8 and June 9, 2004, when Class III milk futures reached levels that produced margin calls

plaintiffs could not meet. Plaintiffs contend that as a result of DFA's manipulative scheme, which supported Class III milk futures prices, they suffered $4,343,613 in out-of-pocket losses. Similarly, Jordan estimated plaintiffs' "no mitigation" losses to be $4,339,436. (Jordan Expert Report ¶ 21, Garrod Decl. Ex. 1, Docket No. 120.) Jordan opines, however, that plaintiffs had a duty to mitigate, that plaintiffs failed to do so and, as a consequence, if plaintiffs succeed on the merits of their manipulation claim, plaintiffs may only claim less than $300,000 in damages. (*Id.* ¶ 31.) Plaintiffs seek to preclude Jordan from testifying that plaintiffs had a duty to mitigate damages prior to June 3, 2004, although plaintiffs concede that Jordan may testify about his opinion on lost profits. (Mem. in Supp. of Mot. to Exclude at 4, Docket No. 112.) For the reasons discussed below, the Court grants plaintiffs' motion as to Jordan's opinion on mitigation of damages as contrary to law.

### 1.      Jordan's Expert Opinion

DFA retained Jordan as its lost-profits and damages expert. Jordan's expert opinion and testimony state that plaintiffs' "gross out-of-pocket losses of over $4 million were the result of large, risky short positions in milk futures, which [plaintiffs] maintained in the face of increasing price volatility (i.e., increasing risk), and persistent indications that [their] market view was wrong." (Jordan Expert Report ¶ 22, Garrod Decl. Ex. 1, Docket No. 120.) Jordan opines that "regardless of the alleged market effects of DFA, . . . [plaintiffs] should have mitigated [their] losses by reducing or

eliminating the [short] positions as market volatility increased and as market prices continually moved contrary to [their] market view." (*Id.*)

Jordan concludes that plaintiffs accumulated significant losses between May 28 (when they could have exited the market with $500,000 in profit) and June 9 (when plaintiffs were forced to liquidate their Class III milk futures at a loss of millions of dollars). (*Id.* at 8 & Ex. 1B.) Jordan concludes that given the market information of which plaintiffs were aware, "exiting the market by approximately June 3 is a reasonable mitigation assumption," and Jordan therefore calculated plaintiffs' gross out-of-pocket damages at no more than $501,327. (*Id.* ¶ 31.)

Jordan notes that between May 14 and May 25, plaintiffs increased their short Class III milk futures position from 631 contracts to the maximum of 1575 contracts. (*Id.* ¶ 23.) Jordan states that plaintiffs' short position as of May 25 "exposed [them] to a substantial risk of loss." (*Id.* ¶ 24.) Jordan notes that plaintiffs reduced their short position to 1100 contracts through June 3 and to 900 contracts on June 8, before margin calls forced plaintiffs to liquidate their short Class III milk futures contracts. (*Id.* ¶ 25.) Jordan concludes that "[t]he risk of [plaintiffs'] large short positions would have been obvious to [plaintiffs] from the large profit/loss swings [they] was experiencing during [the relevant] period." (*Id.* ¶ 26.)

Jordan states that there were two circumstances that should have contributed to plaintiffs' awareness of the risks inherent in holding large short positions in Class III Milk futures contracts. First, Jordan contends that there was significant milk market volatility in May and June that could be seen by simply observing the market. (*Id.* ¶¶ 25-

27.)  Second, Jordan concludes that there were "signs" making it "[e]qually obvious to [plaintiffs] by May 25 . . . that market prices were beginning to behave contrary to [their] market view."  (*Id.* ¶ 28.)  Jordan contends that prior to June 4, "[plaintiffs] could have recognized the riskiness of [their] large short positions and the increased market volatility and elected to reduce or eliminate [their] exposure to the risk of large losses. . . . [Plaintiffs] took undue risk by not reducing or eliminating his exposure to losses in early June."  (*Id.* ¶ 29.)  In short, Jordan opines that the market signals indicating to plaintiffs that they "had been wrong in [his] assessment of the market," were the same signals that plaintiffs saw from May 21, 2004, to June 9, 2004, when plaintiffs finally liquidated their short positions.  (*Id.* ¶ 30.)

At his deposition, Jordan elaborated on the background principles he applied in reaching his expert opinion.  As to his understanding of the "concept of mitigation," Jordan stated, "if a person or institution is at – is in a position where they could be harmed, . . . they should take reasonable steps to prevent that harm, prevent or reduce their harm, regardless of the cause of their harm."  (Jordan Dep. Tr. 125:23 – 126:4, Oct. 22, 2009, Garrod Decl. Ex. 2, Docket No. 120.)  Jordan did not testify that he thought plaintiffs should have known that DFA was manipulating the market at that time, but instead confirmed "that [plaintiffs] had a duty to avoid harm before [they] even knew that the market was being manipulated."  (*Id.* 126:5-16.)  In reaching his opinion, Jordan testified:

> I'm applying a reasonableness standard, and it is based upon whether the
> individual had information that would have allowed him to conclude that he

was in a highly risky position and could readily sustain very large losses in the future.

And so at that point, the individual has sufficient information to draw a conclusion that I'm really exposed here, this is extremely risky, and that that meets the standards of mitigation analysis, I believe, that you – you ask yourself at what point would reasonable behavior by the individual indicate mitigation.

(*Id.* 131:5-16.)  Jordan testified that June 3, 2004, was "a reasonable date at which [plaintiffs] had enough information to have taken reasonable steps to reduce the potential for loss." (*Id.* at 127:1-4.)

## 2.     Contrary to Law

Jordan's mitigation opinion is contrary to law and therefore would not be helpful to a finder of fact in deciding the issues in the case.  "As a general rule, a party defrauded cannot, **after discovery of the fraud**, increase his damages by continuing to expend money on the property retained and recover for such expenditures." *Clements Auto Co. v. The Serv. Bureau Corp.*, 298 F. Supp. 115, 136 (D. Minn. 1969) (emphasis added; internal quotation marks omitted).  The duty to mitigate, however, does not arise before an individual has knowledge of the wrongdoing.  *See, e.g.*, *Connelly v. Hyundai Motor Co.*, 351 F.3d 535, 542 (1st Cir. 2003) ("[T]here is no duty to mitigate damages **prior to sustaining an injury**[.]" (emphasis added)); *Nilson-Newey & Co. v. Ballou*, 839 F.2d 1171, 1175 (6th Cir. 1988) (holding that the duty to mitigate damages "arises only after the defendant's tortious conduct, not before it"); *Arrington v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 651 F.2d 615, 620 (9th Cir. 1981) ("Plaintiffs' damages in a 10b-5 case are limited by what they would have realized had they acted to preserve their assets

or rights when they first learned of the fraud or had reason to know of it."); *Harris v. Am. Inv. Co.*, 378 F. Supp. 894, 900 (E.D. Mo. 1974) ("[A] plaintiff has a duty to mitigate his damages **upon discovery of the fraud**." (emphasis added)).

The parties agree that "[commodity] future customers have a general obligation to mitigate damages." *Samson Refining Co. v. Drexel Burnham Lambert, Inc.*, No. 82-R448, Comm. Fut. L. Rep. (CCH) ¶ 24,596, 1990 CFTC LEXIS 90 (Feb. 16, 1990). However, "complainant's duty to complain about unauthorized trading **does not arise until it learns of the wrongdoing**." *Id.* at 117 (emphasis added). "[A] customer should not be allowed to recover damages for losses occurring after the customer learns of the truth, can reasonably foresee that further damages are likely and does not act reasonably to limit his damages." *Id.* at 115-16 (internal quotation marks omitted); *see also Darrah v. First Am. Inv. Servs. Co.*, No. 05-R042, 2006 CFTC LEXIS 59, at 103 n.23 (June 28, 2006) ("The duty to mitigate doesn't arise until complainant becomes aware of the underlying wrongdoing.").

Jordan states: " [plaintiffs] had a duty to avoid harm before [they] even knew that the market was being manipulated." (Jordan Dep. Tr. 126:5-16, Oct. 22, 2009, Garrod Decl. Ex. 2, Docket No. 120.) In effect, Jordan opines that a commodities trader must take constant precautions against fraud in light of the fact that someone, somewhere, may be perpetrating a fraudulent trading scheme. Such a standard is not supported in the law.

Further, a standard that requires an individual to mitigate damages when he "should have known" of the wrongdoing – as proposed by DFA – is impractical. As the Seventh Circuit stated:

> The best solution is for people not to harm others intentionally, not for potential victims to take elaborate precautions against such depradations. If the victims' failure to take precautions were a defense, they would incur costs to take more precautions (and these costs are a form of loss victims would feel in every case, even if the tort does not occur), while would[-]be tortfeasors would commit additional torts because they would not fear the need to pay up in cases where the victims do not protect themselves. Common law torts have balked at such an outcome in ordinary tort cases, and securities law has followed the same path.

*DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1323 (7th Cir. 1989). Thus, proof that a victim "should have known" of the wrongdoing does not trigger a duty to mitigate, although if the victim **knew** of the wrongdoing and did nothing or "consciously disregarded information" that would have informed him of the wrongdoing, he may not complain. *Id.* at 1324.

In sum, Jordan's mitigation opinion is directly contrary to the law, and the opinion is therefore not helpful to a fact-finder at trial. The Court thus precludes Jordan from testifying at trial regarding Anderson's duty to mitigate.

### C.    Anderson's Motion to Exclude Expert Testimony of Robert Mackay and DFA's Motion to Exclude Expert Testimony of Wayne Brown

Anderson moves to exclude certain portions of DFA expert Robert McKay's opinion relating to (1) the legal definition of manipulation; (2) causation; and (3) intent under the Commodities Exchange Act. (Mot. to Exclude Test. of Robert J. McKay at 1, Docket No. 127.) DFA retained McKay to provide an expert opinion on whether DFA caused artificial prices on the Spot Cheese and Class III milk futures markets and to refute the expert opinion of Anderson's expert, Wayne Brown. (MacKay Expert Op.

¶ 13, Garrod Decl. Ex. 1, Docket No. 129.)  MacKay concludes, *inter alia*, that DFA did not manipulate either the CME spot cheese market or the Class III milk futures market between May 21, 2004, to June 23, 2004.  (*Id.*)

DFA moves to preclude plaintiffs' expert, Wayne Brown, from offering at trial expert testimony regarding whether DFA manipulated the CME Cheese Spot Call and Class III milk futures markets and regarding plaintiffs' damages.  (Mem. in Supp. of Mot. to Exclude Ops. of Wayne R. Brown at 1, Docket No. 117.)  Brown offers two opinions. First, Brown concludes "that DFA manipulated the price of cheese and milk futures when it defended the price of cheese as quoted on the CME from May 21 through June 23, 2004 with cheese purchases in order to unwind its investment in milk futures."  (Brown Expert Report ¶ 12, Mansfield Decl. Ex. 1, Docket No. 118.)  Brown opines that "[b]ecause of the relationship between cheese and milk futures, DFA manipulated the price of milk futures."  (*Id.*)  Brown states that "DFA had 1) the ability to influence prices; 2) the specific intent to create an artificial price; 3) the artificial price existed[;] and 4) causation existed."  (*Id.*)  Second, Brown concludes that given plaintiffs' out-of-pocket losses and lost profits – which were the result of DFA's manipulative activities on the CME Cheese Spot Call – "the most reasonable damages amount is $11,769,253."  (*Id.* ¶ 13.)

Plaintiffs and DFA prematurely brought their respective motions to exclude.  Both parties filed their motions prior to the Court's ruling on DFA's motion for summary judgment, which addresses the appropriate standard for reviewing a CEA manipulation claim.  As a consequence, the parties largely repeat the arguments made at summary

judgment.  The Court therefore dismisses without prejudice plaintiffs' motion to exclude the expert testimony of Robert Mackay and DFA's motion to exclude the expert testimony of Wayne Brown.  The parties may, prior to trial, submit motions to exclude portions of those experts' testimony in light of the Court's ruling on the motion for summary judgment.

This case will be placed on the Court's next available trial calendar.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendant Dairy Farmers of America, Inc.'s Motion for Summary Judgment [Docket No. 102] is **DENIED**.

2.    Plaintiffs Mark Anderson and Killer Whale Holdings, LLC's Motion to Exclude the Testimony of James V. Jordan [Docket No. 110] is **GRANTED**.

3.    Defendant Dairy Farmers of America, Inc.'s Motion to Exclude Opinions of Wayne R. Brown [Docket No. 115] is **DENIED without prejudice**.

4.    Plaintiffs Mark Anderson and Killer Whale Holdings, LLC's Motion to Exclude the Testimony of Robert J. Mackay [Docket No. 127] is **DENIED without prejudice**.

DATED:  September 30, 2010          ____s/ John R. Tunheim____
at Minneapolis, Minnesota.                      JOHN R. TUNHEIM
                                                        United States District Judge